## SOUTHERN RY. CO. v. MAYS.*

### (Circuit Court of Appeals, Fourth Circuit. December 9, 1916.)

### No. 1449.

1. MASTER AND SERVANT ⬤⟿288(5)—INJURIES TO SERVANT—ASSUMPTION OF RISK—KNOWLEDGE OF DANGER.

Plaintiff was foreman of a railroad wrecking crew, and was required by the company to remain with the wrecking outfit whenever it was out on the road, eating and sleeping in the camp car. At the close of a day's work in clearing a wreck, the outfit was to be taken to a town for the night. The movement of the outfit on the road was under the control of a regular train crew, not subject to the wrecking foreman's orders. This crew intended to take some of the wrecked cars which plaintiff had replaced on the rails back to the same town where the wrecking outfit was to spend the night, and the conductor made up the train with the bad-order cars between the engine and the wrecking outfit, though the track was on a grade and the air brakes on the cars could not be connected, so that those on the wrecking outfit were cut off from the engineer's control. Plaintiff warned the conductor of the danger of making up the train that way, but nevertheless the conductor started down the grade without any brakeman at the hand brakes. A coupling between the wrecked cars broke, so that the train pulled apart, and thereafter the two parts collided, injuring plaintiff, who was eating his supper in the camp car. *Held*, that it could not be said as a matter of law that plaintiff assumed the risk, though he knew of the danger, since he was required to remain with the outfit, and the act of the conductor in proceeding after plaintiff's warning was an assurance of safety on which he was entitled to rely.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1077; Dec. Dig. ⬤⟿288(5).]

2. MASTER AND SERVANT ⬤⟿228(1)—INJURIES TO SERVANT—CONTRIBUTORY NEGLIGENCE—EMPLOYERS' LIABILITY ACT.

In an action under Employers' Liability Act April 22, 1908, c. 149, 35 Stat. 65 (Comp. St. 1913, §§ 8657–8665), which provides that contributory negligence shall not bar recovery, but that the damages shall be diminished in proportion to the amount of the negligence attributable to him, a recovery for injuries to a servant is not defeated by proof of his negligence, unless it is shown that such negligence was the sole cause of the injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 670; Dec. Dig. ⬤⟿228(1).]

In Error to the District Court of the United States for the Eastern District of Virginia, at Richmond; Edmund Waddill, Jr., Judge.

Action by Z. E. Mays against the Southern Railway Company to recover for personal injuries. Judgment for plaintiff, and defendant brings error. Affirmed.

Thomas B. Gay and Eppa Hunton, Jr., both of Richmond, Va., for plaintiff in error.

Volney E. Howard and Irvin P. Whitehead, both of Lynchburg, Va., for defendant in error.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. In disposing of the questions involved herein the defendant in error will be referred to as plaintiff, and

the plaintiff in error as defendant; such being the relative positions occupied by the parties in the court below.

The plaintiff was an employé of defendant, and brings this action to recover for personal injury, pursuant to an act of Congress known as the federal Employers' Liability Act. Among other things it is agreed:

"That the defendant was a common carrier by railroad engaged in interstate commerce, that it was operating the railroad mentioned in the declaration as an interstate 1ailroad in interstate commerce, and that the plaintiff was actually engaged as an employé of the defendant in the performance of interstate work on said railroad at the time of receiving the injuries complained of in the declaration."

It appears that the plaintiff was a member and the "foreman" (called "derrick foreman") of a gang of six men, employés of defendant, called a "wrecking crew," with headquarters at Monroe, Va., whose duty it was, upon receiving orders, to go with the Monroe "wrecking train" to any needed point for the purpose of removing wrecked cars or other obstructions from defendant's tracks. This wrecking train consisted of a tool car, truck car, flat car, camp car, and a derrick car. Upon the latter were installed a derrick and a steam engine for operating the same, weighing 74 tons. When the wrecking train was to be moved from one place to another, and while it was out in service, as on this occasion, it was occupied by the wrecking crew as their place of abode at all times when they were not actually at work; and in all of its movements, in shifting on the side tracks or when running on the road, it was in charge of and operated by a regular "train crew," and was drawn by a regular locomotive engine. This train crew consisted of a conductor, an engineer, a fireman, and two brakemen.

The wrecking crew and the wrecking train of which the plaintiff was foreman was sometimes called an "outfit," and this one was called the "Monroe outfit." This outfit, along with a similar outfit from Spencer, N. C., had been engaged for two days in removing a wreck which obstructed defendant's track at Reedy Fork, in the state of North Carolina. On the evening of April 6, 1914, the removal of the wreckage not being completed, the Monroe outfit (the wrecking crew and wrecking train) had been assembled at Brown's Summit, a short distance from Reedy Fork, for the purpose of being taken to Greensboro for the night, to be returned to the scene of the wreck the following morning, for continuing the work. During the day a number of disabled cars had been taken from the wreck and assembled at Brown's Summit. It was a part of the defendant company's program that these disabled cars and the five cars composing the Monroe wrecking train should be made up into a single train, and that this train as thus made up should be run from Brown's Summit to Greensboro.

Preparatory to being placed into this train, the five or six disabled cars had been coupled or chained together by the wrecking crew, with the aid of Conductor Moore of the train crew (as was his duty) under the general supervision of the plaintiff. After the completion of this work, it is insisted by plaintiff that the duty of himself and the other members of the wrecking crew was ended. After the plaintiff had informed Conductor Moore that this work was done, the plaintiff and

all of his crew repaired to the cars of the wrecking train to arrange the tools in these cars for the trip to Greensboro and to eat supper, all of which was in the line of their duty. Thereupon Conductor Moore took charge of the situation; it being the duty of himself and his train crew to assemble and couple the disabled cars to the cars of the wrecking train, making them into a single train, and, after thus making up the train, to run it into Greensboro, all under his sole direction. The plaintiff and his crew took no part in this work, it not being a part of their duty.

It appears that at this juncture the two brakemen of Conductor Moore's train were absent, and that the conductor undertook to move the train by the use of the locomotive engine, without the aid of the brakemen or any other person. It is insisted by plaintiff that the conductor was anxious to start for Greensboro, and therefore did not wait until he could get aid from his own crew, or from Conductor Tarleton and his crew; that, instead of moving the train at that time, he should have waited until it could have been moved with reasonable safety. However, it appears that the conductor succeeded in shifting and getting all the cars together and coupled up on one of the side tracks, with the engine in front looking north, and on a very steep downgrade with five or six disabled cars placed next to the engine, and all the "wrecking train," including the 74-ton derrick car, which was coupled behind and next to the disabled cars, all coupled into one train. The train as thus made up could not be operated by air brake control from the engine, because the air brake apparatus as well as the hand brakes on the disabled cars had been crippled, and air brake connections with the wrecking train could not be made, because they were all behind the disabled cars. The conductor caused the engineer to put the train in motion in this unprotected condition, which caused the coupling between two of the disabled cars to break, thus parting the train, and subsequently the rear part of the train crashed into the forward part from lack of control, causing a collision which was so violent in its nature that two of the wrecking crew were thrown many feet and prone upon the floor of the car, others were knocked against the wall of the car, stoves and tables were wrenched from their fastenings, and the heavy trucks were displaced and thrown from the flat car, so that it required a derrick to replace them. The plaintiff was thereby injured.

At the close of the evidence the defendant moved the court to direct the jury to find a verdict in its favor, which motion was refused, and the case was submitted to the jury with instructions, and the jury found for the plaintiff and assessed his damages at $7,500, from which judgment the defendant sued out a writ of error.

[1] There are a number of assignments of error, but upon argument in this court it was practically conceded that the real question involved in this controversy is as to whether the plaintiff assumed the risk incident to his employment, and therefore is not entitled to recover. It is urged in support of this contention that the plaintiff knew of the unsafe condition of the cars and especially the manner in which they were coupled together, and that in boarding the train at that time he

assumed all the risks incident thereto, and that the court below erred in refusing to direct a verdict in favor of defendant upon these grounds. It appears from the record that plaintiff relied solely on the second count of the declaration. Among other things, the court below in its charge made the following statement as to the grounds set forth in the declaration upon which plaintiff relied for a recovery in this case:

"The jury will not be concerned with any matter contained in the first, third, and fourth counts; the plaintiff not asking anything under those three counts of the declaration. The plaintiff, however, relies on the negligence alleged in the second count of the declaration. The acts of negligence alleged in the second count and relied on by the plaintiff are the following, namely: Negligence on the part of the conductor (1) in causing or permitting the train, as it was then made upon the side track, to be put in motion while the wrecking cars which were then occupied by the plaintiff and other members of his crew were coupled to said train; and (2) without any provision for controlling the movements of said train, or any car thereof, either by air brake or by hand brakes; and (3) in negligently failing to keep any reasonable or adequate lookout or watch for the purpose of ascertaining if the said train or any portion thereof should become parted from another portion thereof; (4) or for stopping the rear part if it should become parted; (5) or to provide for such lookout or watch."

The position occupied by the plaintiff required the performance of certain duties, and a careful examination of the evidence leads us to the conclusion that he did everything on this occasion required of him as foreman of the wrecking crew. From the very nature of things the plaintiff as foreman of this crew had charge of the rerailing of the cars, and, among other things, it follows that he was required to determine as to whether the cars rerailed were capable of being moved. We find nothing in the record to show that any of the cars rerailed were not capable of being hauled to Greensboro.

The duty of moving the train, as we have stated, likewise devolved upon the train crew, under the direction of the conductor. The plaintiff, who testified in his own behalf, after having described the location of the tracks, and referring to the fact that he had performed all the duties required of him, except to fasten the derrick down with screws, and to chain it so as to keep it from turning around when the car was in motion, said:

"We had to stop and wait for him to make this coupling, and to keep him from pushing over us while we were fastening down, and cleaning out the ash pans and fixing the machine up in general to run, and when we got through with our work we walked down to the lower end—the north end—of the cars where the engine was, and the conductor then asked if he could move down to the switch. I told him, 'Yes;' and I asked him the question what was he going to do, and he said, 'Pull them out and shove them up on the main line, all of them;' and I told him that he had his train made up in the position he wanted to run, that if I was in his place I would not handle them, that those cars (the crippled cars) were not in condition to handle them, with a heavy 70-ton derrick on the far end of them, and the engine on the other end; and he did not say anything more. I suggested that he * * * might put his engine out on the main line, and let his cars drop out when he got ready to go, and let them couple up; that he was going to take the crippled cars to Greensboro."

The plaintiff further testified that:

"It was not reasonably safe to start a train coupled up as it was at that time without air brakes and without anybody at the hand brakes; that it was not safe at all, otherwise he would not have called the conductor's attention to it; that he would have just taken it for granted that he knew it was dangerous, and would not have undertaken to move them; that he called the conductor's attention to it before he went into the car; * * * that it was unusual to move a train in that condition."

We find the following in the evidence of the witness Harvey:

"Q. * * * Now, I want to ask you if it was, or was not, a safe and prudent thing to put that train in motion, on a downgrade, without anybody to man the hand brakes of the wrecking train, and with no air on the train? A. No, sir; I would not consider it prudent or safe by any means."

This witness also said that, if the exigency was such as to require the train to be moved at once and without waiting for the brakemen, the conductor should have "given the signal to the engineer and have handled the brakes his own self." It is true that there was a conflict between the evidence offered by plaintiff's and defendant's witnesses as to the way in which the train was made up, etc., but all such questions were submitted to and passed upon by the jury. It also appears from the evidence that the foreman and wrecking crew, while not engaged in work, lived in the camp car; that is to say, took their meals in this car and also slept there, and were, among other things, by virtue of their employment, required to accompany the wrecking train whenever and wherever the defendant might desire to take it in the course of doing the particular work which this crew was required to do.

It is true that the foreman called the conductor's attention to the fact that it was unsafe in his opinion to move the cars as then made up, and especially in view of the fact that the car with the heavy derrick was attached to the rear of the bad-order cars, which caused an unusual strain on the temporary couplings that were being used on some of the crippled cars. From this circumstance it is argued by counsel for defendant that the plaintiff had full knowledge of the dangerous and unsafe manner in which the train had been made up, and that therefore as a matter of law he assumed any risk incident to boarding the train while in that condition. In this respect counsel seems to overlook the fact that the defendant owed the duty to the plaintiff to make up the train in a reasonably safe condition, and likewise to operate the same in a reasonably safe way. The fact that the conductor, after having been warned by the plaintiff as to the condition of the train, failed to adopt the suggestions of the plaintiff and proceeded to move the train as then made up, under the circumstances was in the nature of an assurance to the plaintiff that the train was in a reasonably safe condition at that time.

While, according to plaintiff's own testimony, it was more or less hazardous to move the train in its then condition, yet he testified that if the conductor had required the services of the brakemen, so as to control the movement of the train, the accident would not have occurred. The plaintiff, having performed his duty, had a right to

expect that the conductor would employ such means as might be necessary to insure safety in moving the train, and this proposition was submitted to the jury, and the issue thus raised was found in favor of the plaintiff; i. e., that the proximate cause of plaintiff's injury was due to the negligent manner in which the train was moved under the immediate direction of the conductor. The plaintiff only assumed such risks as were incident to the condition of the cars of which he had knowledge, or by diligence could have known. For instance, if he had rerailed a car with a broken axle or other defect, with full knowledge at that time of the existence of such defect, and that it rendered the car incapable of being safely transported, he would have assumed any risk incident to the moving of such car.

From the evidence it appears that the cars were in condition to be moved, and that the wreck was due to the fact that they were improperly placed, and, owing to the absence of the brakemen, improperly handled. Therefore his injury was due to the negligence of the conductor, which resulted in bringing about a condition that plaintiff could not have reasonably anticipated, and under such circumstances it would be manifestly unfair to hold that he had assumed the risk incident to a condition over which he had no control, and which had been created by the negligent acts of a fellow servant. This would be especially true when we consider, as we have already stated, that plaintiff was compelled to accompany the wrecking train from place to place under the direction of the defendant. At any rate, the question as to whether the defendant assumed the risk was one for the jury to determine.

[2] It appears, among other things, from the testimony, that a link had been used for the purpose of coupling the cars, and that this coupling was the one that broke and caused the wreck. It is therefore insisted by counsel for defendant that inasmuch as plaintiff made the coupling with this link, instead of chaining the cars together, he thereby contributed to his own injury. This cannot avail the defendant for two reasons: (1) It appears that the conductor furnished the link used for this coupling and was present when the coupling was made; and (2) the doctrine of contributory negligence does not so apply in an action of this character as to prevent any recovery; also the statute under which this suit was instituted provides that contributory negligence "shall not bar recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé."

In considering the facts in this case we should keep in mind the distinction between the consequences of contributory negligence and assumption of risk. Under the federal Employers' Liability Act one is only barred from recovery where it appears that he assumed the risk incident to his employment. On the other hand, contributory negligence is not a bar to recovery, and can only be considered in ascertaining the extent to which damages are to be mitigated. In the case of Illinois Central Railway Co. v. Skaggs, 240 U. S. 66, 36 Sup. Ct. 249, 60 L. Ed. 528, the Supreme Court said:

"It may be taken for granted that the statute does not contemplate a recovery by an employé for the consequences of action exclusively his own; that is, where his injury does not result in whole or in part from the negligence of any of the officers, agents, or employés, of the employing carrier, or by reason of any defect or insufficiency, due to its negligence, in its property or equipment. * * * But, on the other hand, it cannot be said that there can be no recovery simply because the injured employé participated in the act which caused the injury."

From the foregoing it follows that, to defeat a recovery, it must be shown that the sole cause of the injury was due to the negligence of the plaintiff, and in the light of the facts in this case it would be absurd to say that the plaintiff alone contributed to the cause of his injury. In the case of Seaboard Air Line Railway Co. v. Horton, 239 U. S. 595, 36 Sup. Ct. 180, 60 L. Ed. 458, the Supreme Court, in referring to the difference between assumed risk and contributory negligence, said:

"That there was a constant danger that the tube might explode was abundantly proved, and was admitted by plaintiff. * * * The jury might reasonably believe that such a water glass would probably not explode in the ordinary use of it, unless it was imperfect * * * in some respect other than the absence of the guard glass, and that, since there was no evidence of this, Horton was justified in assuming that the danger of an explosion was not immediately threatening. * * * It would require a much plainer case than this to justify taking the question from the jury."

At an earlier hearing of the case of Seaboard Air Line Railway Co. v. Horton, 233 U. S. 503, 34 Sup. Ct. 639, 58 L. Ed. 1070, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475, the Supreme Court also held that, as a general rule, assumption of risk is one of fact for the jury, except in cases where it is clearly established by the evidence that plaintiff had assumed the risk. Then it becomes a question of law to be decided by the court. In referring to this point the court said:

"The distinction, although simple, is sometimes overlooked. Contributory negligence involves the notion of some fault or breach of duty on the part of the employé; and since it is ordinarily his duty to take some precaution for his own safety when engaged in a hazardous occupation, contributory negligence is sometimes defined as a failure to use such care for his own safety as ordinarily prudent employés in similar circumstances would use."

It is earnestly urged that the court below erred in refusing to grant certain instructions as tendered by defendant. An examination of these instructions shows that in the main they were given as requested, but it does appear that they were modified so as to conform to the theory upon which the case was tried, which we think was correct. It therefore follows that the assignments of error which pertain to those facts of the case are without merit.

For the reasons stated, the judgment of the lower court is affirmed.